UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

VS.                          CASE NO: 2:10-cr-48-FtM-29CM

NELSON CRISTIANO MACHADO,
JR.

_____

**OPINION AND ORDER**

This matter comes before the Court on defendant's Amended Motion to Dismiss the Indictment Based Upon Constitutional Speedy Trial Violation (Doc. #42) filed on April 15, 2016. The Government's Response (Doc. #39) to the original motion was filed on April 6, 2016. The Court conducted an evidentiary hearing on April 20, 2016. For the reasons set forth below, the motion is **DENIED.**

**I.**

The testimony at the evidentiary hearing and the record in the case reflect the following factual chronology:

**July 8, 2005 to November 3, 2005:** Defendant is alleged to have engaged in a real estate scheme to defraud between these dates in Lee County, Florida. (Doc. #1.)

**2009:** A federal task force of state and federal agents were investigating mortgage loan fraud cases in the Lee County, Florida

area and elsewhere.   Law enforcement first became aware of the allegations that defendant had engaged in the scheme to defraud in 2009, by which time defendant was residing in Bradenton, Florida.

**November 12, 2009:**  Task Force officer and Florida Department of Law Enforcement (FDLE) agent Grant Wagner went to defendant's last known address in Bradenton, Florida to speak with defendant. Defendant was not present, but Agent Wagner spoke with defendant's parents.  Defendant's parents told Agent Wagner that defendant was at church where he worked as a pastor.   Agent Wagner left a business card with his contact information, and asked the parents to have defendant call him as soon as possible.  Agent Wagner was told defendant did not speak English well, but defendant's wife could translate.

Later on November 12, 2009, Agent Wagner received a telephone call from defendant, who asked the agent to speak with his wife. Agent Wagner told defendant's wife that he wished to speak with them concerning real estate properties in Lee County, Florida. Defendant's wife told Agent Wagner that they would be willing to speak with him, but would be out of town until the following week. This was the last contact Agent Wagner had with either defendant or his wife.

**December 11, 2009:**  Defendant accepted a position as pastor of the Assembly of God Church in Brazil, and flew to Brazil with his family.

**February 22, 2010:**  Defendant returned to the United States from Brazil, and stayed at his sister-in-law's house (Kedma Susan Miranda) in the Orlando, Florida area.   While Ms. Miranda estimated defendant stayed for about two weeks, it appears defendant stayed for about a month before he returned to Brazil. Defendant made no attempt to contact Agent Wagner, and Agent Wagner did not know defendant's whereabouts at the time.

**March 21, 2010:**  Defendant left the United States, flying back to Brazil.   According to Ms. Miranda, defendant took his family with him.

**April 7, 2010:**  An Indictment (Doc. #1) is filed against defendant charging three counts of wire fraud in connection with a scheme to defraud involving real estate in Lee County, Florida. A federal arrest warrant for defendant was issued on the same date (Doc. #13.)

**April 8, 2010:**  Agent Wagner and other agents attempted to arrest defendant at his last known address in Bradenton, Florida, but someone else was living there.   Agent Wagner was told by the current resident that defendant no longer lived there, and was believed to have left for Brazil in December, 2009 for a job with the church.   The current resident had replaced defendant at the local Assembly of God church, and believed defendant would return to the United States in about June, 2010 to sign over some church paperwork.

Agent Wagner went to the Bradenton church, and was told defendant was no longer employed there and had moved back to Brazil.

Agent Wagner verified with Homeland Security that its records confirmed that defendant left the United States for Brazil in March, 2010.

**April 8, 2010:** Agent Wagner spoke with the secretary of the First Assembly of God Church in Bradenton, Florida. The secretary confirmed that defendant used to preach a Portuguese language service at the church, but believed defendant had moved back to Brazil with his family.

**April 16, 2010:** The federal arrest warrant for defendant was entered in the National Crime Information Center (NCIC). Entry of the arrest warrant would alert law enforcement officers that there was an active arrest warrant for defendant should defendant be located or encountered.

**May 25, 2010:** Defendant flew back to the United States from Brazil, and stayed for about a month in the Orlando, Florida area with his sister-in-law.

**June 25, 2010:** Defendant returned to Brazil, leaving from the international airport in Miami, Florida.

**2010-2015:** Agent Wagner made periodic checks on various law enforcement databases for defendant, but found no further information. The databases included the Florida driver's license

database and the Florida wage and hour database.  The databases would not reflect the opening of a bank account or application for or receipt of a credit card.

Defendant remained in Brazil for the next 4-1/2 years, from June 25, 2010 until December 10, 2014.

**September, 2012:**  Ms. Miranda, defendant's sister-in-law, moves to a new address on Regina Way in the Orlando, Florida area.

**February 25, 2014:**  Agent Wagner caused an FDLE analyst to check various databases for information about defendant, and prepared a written report.  The analyst found no current employment information or a current driver's license in the United States.  The active arrest warrant was noted in the databases.

**December 10, 2014:**  Defendant traveled from Brazil to the United States, arriving at the Detroit, Michigan Metropolitan Airport.  Defendant stayed for about three months at his sister-in-law's house in Orlando with his three children and both parents.

**December 12, 2014:**  Using his sister-in-law's most recent Orlando address, defendant renewed his Florida driver's license. Def.'s Ex. 3.  Ms. Miranda accompanied defendant because he did not have any documentation to show residency in the United States.

**December, 2014:**  Defendant opened a bank account at Regions Bank.  Def.'s Ex. 4.

**December, 2014:** Defendant applied for and received a Capital One credit card while residing with his sister-in-law.  Def.'s Ex. 2.

**January, 2015:**  Defendant's sister-in-law filed a civil lawsuit against defendant in Orange County Circuit Court in order to obtain temporary custody of defendant's children when he returned to Brazil.  Defendant was present for the filing of the lawsuit, and agreed to it.  As discussed below, defendant left the United States prior to the entry of the temporary custody order regarding his three children.

**February 9, 2015:**  Defendant left the United States from Detroit Metropolitan Airport and flew to Brazil.  No alert based on the active arrest warrant was triggered, apparently because the date of birth for defendant was one day off his actual date of birth.  Defendant's three children and his parents stayed in Orlando at defendant's sister-in-law's house.  Defendant returned to Brazil because of his job there as a pastor with the Assembly of God Church, and left the children in Orlando primarily because of school.

**March 15, 2015:**  The Orange County Circuit Court enters an order giving defendant's sister-in-law temporary custody of his three children.  Def.'s Ex. 5.

**January, 2016:**  Roberto Pena, an officer of the U.S. Customs and Border Protection stationed at the Orlando International

Airport, examined advance passenger information received from airlines for flights which depart from a foreign country.  Officer Pena discovered the name of a passenger on a certain flight coming from San Paulo, Brazil which matched defendant's name, and the active federal arrest warrant.  His agency notified the Federal Bureau of Investigation (FBI) to confirm the arrest warrant was still active.

**January 21, 2016:**  Law enforcement officers confront defendant as he entered the United States from Brazil at the Orlando, Florida International Airport.  After confirming his identity, defendant was arrested on the federal arrest warrant in this case.  (Doc. #13.)

**January 22, 2016:**  Defendant appeared before a federal magistrate judge in Orlando, Florida.  (Doc. #5.)

**January 25, 2016:**  Defendant executes an Appearance Bond (Doc. #12) and is released upon certain conditions (Doc. #11).

**February 9, 2016:**  Defendant had a reservation for this date to return to Brazil.  Thus, defendant had intended only a two-week visit in Orlando.

A timeline depicting defendant's time spent in the United States and Brazil from December, 2009 to the present is attached as Exhibit 1.

## II.

Defendant asserts that the delay between the filing of the Indictment on April 7, 2010 and his arrest on January 21, 2016 was a violation of his constitutional right to a speedy trial. The government sees it otherwise, as does the Court.

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ." U.S. Const. amend. VI. The Supreme Court has described the speedy-trial right as "amorphous," "slippery," and "necessarily relative." Vermont v. Brillon, 556 U.S. 81, 89 (2009) (quoting Barker v. Wingo, 407 U.S. 514, 522 (1972)). Instead of adopting an inflexible approach, the Supreme Court has "established a balancing test, in which the conduct of both the prosecution and the defendant are weighed." Id. at 90 (quoting Barker, 407 U.S. at 529, 530). Doggett v. United States, 505 U.S. 647 (1992) is the leading case addressing delay in arrest after the return of an indictment, and analyzed such delay utilizing the four Barker factors: "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." Id. at 651 (citation omitted).

**A. Length of Delay**

There is a twofold inquiry as to the length of delay. First, defendant must show that "the interval between accusation and trial has crossed the threshold dividing ordinary delay from 'presumptively prejudicial' delay." Id. at 651-52. If defendant makes this showing, the court must then consider the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. Id. at 652 (citation omitted).

In this case, defendant was indicted on April 7, 2010 and arrested on January 21, 2016. This delay of more than 5-1/2 years is sufficient to trigger the speedy trial inquiry. Id. at 652 n.1 (noting that courts have generally found postaccusation delay presumptively prejudicial when it approaches one year). See also United States v. Ingram, 446 F.3d 1332, 1336 (11th Cir. 2006). The delay also extended significantly beyond the minimum necessary to show presumptive prejudice. See Doggett, 505 U.S. at 652 (explaining that "the presumption that pretrial delay has prejudiced the accused intensifies over time"). This factor, therefore, weighs against the government. United States v. Villarreal, 613 F.3d 1344, 1350-51 (11th Cir. 2010).

**B. Reason for Delay: Relative Blame for Delay**

The next inquiry examines the reasons for the delay, and evaluates whether the government or the defendant is more to blame for the delay. Doggett, 505 U.S. at 652-53. The burden is on the

prosecution to demonstrate the cause of the pre-trial delay. Ingram, 446 F.3d at 1337. The court allocates different weight to different reasons for delay:

> (1) "[a] deliberate attempt to delay the trial in order to hamper the defense [is] weighted heavily against the government"; (2) "[a] more neutral reason such as negligence or overcrowded courts [is] weighted less heavily [against the government] but nevertheless [is] considered since the ultimate responsibility for such circumstances must rest with the government rather than the defendant"; and (3) "a valid reason, such as a missing witness, . . . serve[s] to justify appropriate delay." A government's inability to arrest or try a defendant because of the defendant's own evasive tactics constitutes a valid reason for delay. But the government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith.

Villarreal, 613 F.3d at 1351 (alterations in original) (internal citations omitted).

The Court finds that the government has not acted with a deliberate attempt to delay the arrest of defendant or to hinder defendant's defense. The Court finds no bad faith on the part of the government, and that the government agents acted in good faith and with due diligence in attempting to locate and arrest defendant. Government agents attempted to locate and arrest defendant the day following the Indictment, and determined that he had left the country with his family. Agents placed the arrest warrant in the NCIC computer, and periodically monitored databases thereafter. Defendant in fact left the country with his family, and never contacted Agent Wagner despite being requested to do so

pre-indictment.   While there is no evidence that defendant knew he had been indicted, he did know Agent Wagner wanted to talk with him about real estate located in Lee County.   Defendant entered the United States on three separate occasions for relatively short periods of time, residing at his sister-in-law's residence in another county and never returning to his former residence or employment.   Of the approximately 68 months from the date of Indictment to date of arrest, defendant was in the United States for about 3 months.   This factor weighs heavily against defendant.

**C. Defendant's Assertion of Speedy Trial**

Defendant invoked his speedy trial right after his arrest during the normal course of the criminal proceedings.   Given the lack of evidence that defendant knew he had been indicted, the timing of the invocation does not weigh against defendant.

**D. Prejudice as Result of Delay**

The final factor is the extent to which the defendant suffered actual prejudice from the delay.   In the Eleventh Circuit, if the first three factors do not weigh heavily against the government, a defendant generally must demonstrate actual prejudice to succeed on his speedy trial claim.   Villarreal, 613 F.3d at 1355; United States v. Dunn, 345 F.3d 1285, 1296-97 (11th Cir. 2003); United States v. Register, 182 F.3d 820, 827 (11th Cir. 1999)).   The Court assesses the prejudice suffered by the defendant in light of the three interests of the defendant the speedy trial right was

intended to protect: (1) "to prevent oppressive pretrial incarceration;" (2) "to minimize anxiety and concern of the accused;" and (3) "to limit the possibility that the defense will be impaired." Villarreal, 613 F.3d at 1355 (citing Barker, 407 U.S. at 532); Doggett, 505 U.S. at 654. The "most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Villarreal, 613 F.3d at 1355 (citation omitted).

The evidence at the evidentiary hearing did not establish any prejudice to defendant from the delay, but counsel proffered potential prejudice in trial strategy and available witnesses. Here, defendant was not in custody until his January 21, 2016 arrest, and was released on pretrial conditions, so there was no "oppressive pretrial incarceration." Since there was no evidence he knew of the Indictment, there could be no resultant "anxiety and concern" about it. The only remaining type of prejudice, and the most important, is an impaired defense "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Doggett, 505 U.S. at 654 (citation omitted).

Barker explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." 407 U.S. at 532. Doggett stated

> that excessive delay presumptively compromises the
> reliability of a trial in ways that neither party can
> prove or, for that matter, identify. While such
> presumptive prejudice cannot alone carry a Sixth
> Amendment claim without regard to the other Barker
> criteria, it is part of the mix of relevant facts, and
> its importance increases with the length of delay.

Doggett, 505 U.S. at 655-56; Villarreal, 613 F.3d at 1355-56

(concluding no speedy-trial violation, although nearly 10-year

delay from indictment to arrest, which weighed against convicted

defendant).

Here, defendant generally alleges that the delay has weakened

his "ability to raise specific defenses, procure necessary defense

witnesses and elicit specific testimony." (Doc. #42, p. 4.) At

oral argument, defendant's counsel argued that defendant has been

prejudiced due to Transatlantic Mortgage Lending Group, Inc. going

out of business. The Court finds this insufficient to establish

prejudice. Defendant has not indicated when Transatlantic went

out of business, what effect that has on his defense, or how the

delay increased any prejudice suffered from Transatlantic going

out of business.

The Court balances the four factors as follows: The first

factor weighs in favor of defendant. The second factor weighs

against defendant because he was in a foreign country for the vast

majority of the time and the government agents continued to make

efforts to locate and arrest him. The third factor weighs in

defendant's favor since he has raised his speedy trial issue in a

timely manner.   The fourth factor weighs against defendant because there is an insufficient showing of prejudice. On balance, the Court finds the government did not deprive defendant of his right to a speedy trial.

Accordingly, it is hereby

**ORDERED:**

Defendant's Amended Motion to Dismiss the Indictment Based Upon Constitutional Speedy Trial Violation (Doc. #42) is **DENIED.**

**DONE and ORDERED** at Fort Myers, Florida, this ___12th___ day of May, 2016.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record

– 14 –